UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MONICA DeMERELL, Personal
Representative of the Estate of
Michael David DeMerell, Deceased,

                                           Case No. 04-10218-BC

       Plaintiff,                          Honorable David M.  Lawson

v.

CITY OF CHEBOYGAN, CHEBOYGAN
DEPARTMENT OF PUBLIC SAFETY, KURT
JONES, and RONALD WHITE,

            Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Michael David DeMerell was shot and killed by a Cheboygan city police officer on March

13, 2002 during an attempt to arrest him.  DeMerell's daughter filed a four-count complaint alleging

that Kurt Jones, the shooter, violated DeMerell's constitutional rights by unreasonably using lethal

force contrary to the Fourth Amendment.  Chief of police Kurt Jones, the City of Cheboygan, and

the department of public safety have been sued on theories of supervisory and municipal liability.

The plaintiff also has alleged claims under the Michigan constitution and state tort law.  The

defendants have filed a motion for summary judgment alleging that they are entitled to judgment as

a matter of law on the basis of qualified immunity under federal law, governmental immunity under

Michigan law, and that liability cannot be imposed against the City and Jones on a *respondeat*

*superior* theory.  The plaintiff responded, and the Court heard oral argument on August 5, 2005.

The Court now finds that the undisputed facts demonstrate that no actionable federal or State law

violations can be proved and the motion for summary judgment must be granted.

I.

The decedent, Michael David DeMerrell, lived with his girlfriend, Aleta Siefert. In 1990, DeMerrell and Siefert moved to Cheboygan, Michigan. According to Siefert, initially the move was a change for the better, but DeMerrell suffered medical problems, including a crushed vertebra in his neck that required fusion surgery, and he became unable to work, and began receiving Social Security disability payments.

Compounding this problem, DeMerrell was an alcoholic. Siefert recalled at her deposition that he had been struggling with the disease since "he was, like, 15." Pl.'s Resp. Br. Ex. 1, Siefert dep. at 18. And after the surgery, DeMerrell began taking both Oxycoton and Oxycodone, pain medications prescribed by his doctor. *Id.* at 25. In January 2002, DeMerrell completed inpatient rehabilitation for alcoholism at Birchwood in Alpena, Michigan. *Id.* at 38. Unfortunately, DeMerrell's sobriety was short lived and his drinking bothered Siefert. Siefert testified that "shouting matches" often resulted when she confronted DeMerrell about his drinking. *Id.* at 39.

On March 13, 2002, the day of DeMerrell's death, a friend of DeMerrell came to visit him at his residence in the morning. Keith LaDuke, DeMerrell's friend, apparently was having an anniversary and "wanted someone to party with." *Id.* at 40. Siefert stated that LaDuke brought a case of beer with him and he and DeMerrell began drinking in the kitchen and dining room. *Id.* at 41. LaDuke left sometime before dinner. *Ibid.* In the early afternoon, Siefert realized that DeMerrell was "very inebriated." *Id.* at 42. After DeMerrell unsuccessfully attempted to maneuver his truck and wood-laden trailer backward up a hill ("but he ended up with the Blazer stuck on top of the wood on top of [the] trailer"), Siefert pointed out the folly of his behavior and called him "an idiot" and "stupid." *Id.* at 42-43.

-2-

DeMerrell continued to drink after this exchange. *Id.* at 43. Siefert tried to get DeMerrell to eat because "usually if he ate he would go to sleep." *Ibid.* DeMerrell, however, refuse to eat. At some point, Siefert became fed-up and confronted DeMerrell.

> I was just tired of it and I told him he was just being an idiot and I was sick of it and, you know, then he's screaming at me and it's just the ususal back and forth. And I know I made the comment, 'Well, you don't do anything. You just sit around here all day drinking beer. I'm tired of it. I work all day. You could do something.' And that's when he said, 'I never do anything around here; right?' And I said, 'No, you don't.'

*Id.* at 44. Angered, DeMerrell went outside and returned with pruning shears. *Ibid.* He then began to shred the lampshades "because he had made the bases of the lamps." *Ibid.* After he had cut up two shades, DeMerrell took the shears back outside. *Id.* at 45. When he came back inside, Siefert informed him that she did "not want to deal with [him]." *Ibid.* Siefert then took her grandchild, Julie, and retired to her room to go to bed. *Ibid.*

A short time later, Siefert heard the back door open and shut and what she believed was DeMerrell trying to start a chainsaw. *Ibid.* She proceeded downstairs and found DeMerrell in the kitchen with a chainsaw. *Ibid.* He explained that he wanted to "destroy everything he had ever made." *Ibid.* Siefert took the chainsaw from him, threw it out the door, and again informed DeMerrell that "he was an idiot[.]" *Ibid.* DeMerrell then left the kitchen, and Siefert walked toward her bedroom. *Ibid.* Siefert explained that as she was walking back to her bedroom, "I felt something really strange on my back." *Id.* at 46. She turned to see DeMerrell "come at me with the knife." Siefert recalled:

> Q.    Came into your bedroom with a knife?
> A.    Right; and I threw up my arm and he went to stab me and –
> Q.    Is Julie still awake?
> A.    Jule was behind me. She was awake. She was behind me.
> . . .

-3-

> Q.      Now, he came at you with the knife raised?
> A.      Yeah.
> Q.      And what did you do?  You put your hands up to defend?
> A.      I put my arm up, and that's (indicating) where he caught me?
> Q.      And you're showing me now the scar on your – it would be on your left forearm?
> A.      Yup.

*Id.* at 47.

Siefert noted that DeMerrell was wielding a "pocket knife type thing" and that she kicked him or hit him, knocking him back toward the bedroom closet. *Id.* at 48. She grabbed the knife, jumped over the bed, and fled the house. *Id.* at 48-49. Apparently, DeMerrell managed to stab Siefert in the back as she ran away. *Id.* at 49. Siefert ran to a neighbor's house, but no one was home. *Ibid.* At that point, when she was a block and a half from her home, DeMerrell "told me to come back or he was going to hurt Julie." *Ibid.* Siefert initially was scared but thought that DeMerrell would not harm Julie, and the better course of action was to find a neighbor and call the police. *Id.* at 49.

Eventually, Siefert arrived at Stanley Myshock's house and described her problem. *Id.* at 51. Myshock went upstairs and phoned the police. *Ibid.* Myshock's wife gave Siefert a towel to help stop the bleeding. *Ibid.* Thereafter, the police arrived. Siefert recalled discussing the following with the police officer:

> Q.      Did you relay to this officer pretty much what you had just told us about how you'd been attacked and stabbed?
> A.      Yes.
> Q.      Did you tell the officer that he had threatened to hurt Julie?
> A.      Yes.
> Q.      Did you tell him anything more than that?
> A.      No.
> Q.      So you did not tell him, "I don't really think he's going to do it, but he's threatened to hurt her"?
> A.      No, I just said, 'You got to get her out of there.'

-4-

. . .

Q.    I mean, what was your thought as far as you told him he had to get Julie out of there?  What was your thought when you said that?

A.    My thought was, I didn't think he would hurt her, but I knew she was scared and that somebody had to get to her.

*Id.* at 52.

Officers Ronald White and Ron Hartman responded to the 911 call at approximately 10 p.m. that evening.  Pl.'s Resp. Br. Ex. B, White dep. at 14.  Upon arriving at Myshock's home, officer White recalled "a lot of yelling and screaming and that we had a victim there, Alita, that had been stabbed, I was told, once in the arm and once in the back." *Id.* at 15.  Officer White observed "blood, rags, the wound on her back." *Ibid.*  Officer White asked Siefert who had inflicted the wounds and determined DeMerrell was responsible. *Ibid.*  White testified that he "obtained as much information as he could at that time and then went to Mr. DeMerrell's residence." White testified:

Q.    And can you tell me all the information you obtained?

A.    Just the type of injuries that she had, whose house she was at when she made the 911 call, who did the stabbing, if there was anyone else with him, did he leave in a vehicle, does he have access to any weapons, things of those nature.

Q.    What did she tell you about who was with him?

A.    She said a 2-year-old – I can't remember if she said 'daughter' or 2-year-old 'child.'

Q.    And she had told you that Michael DeMerrell stabbed her?

A.    Yes.  She said Mike DeMerrell had stabbed her and that if she told the police, that he was going to kill the child.

*Id.* at 16-17.

Officer White also testified that he had had prior run-ins with DeMerrell on a half a dozen occasions. *Id.* at 17.  According to White, "Mike has some problems with dogs that would run at large.  Him and Alita would have verbal disagreements that sometimes where physical. He had an

incident with Officer Frazer where Office Frazer was assaulted." *Id.* at 18. Officer White further recalled that on a majority of these occasions DeMerrell was drunk. *Ibid.*

Officer White arrived at DeMerrell's residence along with two state police troopers, Boulan and Michael Pionk. *Id.* at 20. White positioned his SUV police vehicle in DeMerrell's driveway. He walked to the back of the home to look for DeMerrell; sometimes DeMerrell had barbeques and would sit with friends in the back. *Ibid.* White recalled that it the lighting was dim, but that lights inside were on. *Ibid.* There was also a street light in front of the house. At the back of the house, White was greeted by a large German shepherd and "immediately turned around and walked towards the house where a general entrance was to the house." *Ibid.*

When officer White arrived at the general entrance he looked through the screen door. He did not hear the child crying but he saw her next to DeMerrell. She did not appear to be in distress. However, White "saw a weapon that Mr. DeMerrell was holding that caused [him] concern because the child was right next to him." *Ibid.* Officer White further described the situation:

> Q. How far away was the child from Mr. DeMerrell?
> A. Like right next to him.
> Q. And how was he holding the weapon?
> A. In his hand.
> Q. Which hand, please?
> A. I believe it was his right hand.
> Q. And where was the weapon pointed?
> A. Towards the ground.
> Q. And what was he doing with the other hand?
> A. Reaching for something.
> Q. What was he reaching for?
> A. It might have been the lower dresser drawer or on the ground; close
>    proximity to himself.
> Q. Did you see what he was reaching for?
> A. No.

*Id.* at 24-25.

Upon seeing the weapon and that DeMerrell was reaching for something, officer White testified that "within seconds I was on the radio, advised the other officers and retreated." *Id.* at 25. White returned to his patrol vehicle, "grabbed the shot gun that was issued to that vehicle," and moved toward the back portion of the SUV near the tailgate. *Ibid.* According to White, his patrol vehicle, a GMC Yukon, was parked in the driveway facing the front of the house. *Id.* at 26. Trooper Boulan also took cover behind the Yukon with officer White. *Ibid.* White also thought that trooper Pionk "had taken up position by his patrol vehicle." *Ibid.*

By then, other officers from the Cheboygan County sheriff's department had arrived. Officer White stated that they stopped on the roadway, exited, and took up position behind their vehicle. *Id.* at 27. Thereafter, officer Hartman arrived at the residence. *Ibid.*

White described the events occurring over the next three to five minutes after he radioed that DeMerrell had a weapon, which culminated in him discharging his shotgun and killing DeMerrell:

> Q.   And I'd like you to tell us, please, what happened during those three to five minutes. You told us you retreated back behind your vehicle. Did you end up staying behind your vehicle or did you go to another vehicle.
> A.   Stayed behind my vehicle for a short period of time. And we were advised by another officer that he was walking towards the front of the vehicle, which would have been the driver's side front corner. I was positioned on the driver's side rear bumper.
> Q.   Of which vehicle?
> A.   My vehicle.
> Q.   Okay
> A.   So I was within, say, 15 feet of Mr. DeMerrell at that point. And then at this point he brought the weapon down to his side or turned his back towards us, but we received direction from another officer. It may have been Mr. – Trooper Pionk. I'm not sure. We then retreated back to the Cheboygan County Sheriff's Department's vehicle to take cover.
> Q.   This is when he was about 15 feet away?
> A.   Somewhere around there, yes.
> Q.   Could you see him at this point?
> A.   No.
> Q.   Where was he?
> A.   He was at the front of the vehicle.

. . .

Q.      What did they tell you to do?  You're being directed by the other officers. What did they say, specifically?

A.      'He's coming out of the house.  He's got the gun in his hand.  He's walking towards the vehicle.  He's by the front corner of the vehicle.'  And then at some point he turned –

Q.      Well, let me just stop you there.  So they didn't tell you to retreat?  You made that determination on your own?

A.      Correct.

Q.      And when you made that initial determination to retreat to the other vehicle he was approximately 15 feet from you?

A.      I have no idea at that point when I retreated.

Q.      All right.  So after you retreated, what happened next?

A.      Trooper Boulan and myself both retreated back to the sheriff's department vehicle and took cover behind the engine block.

. . .

Q.      All right.  So what happened next?

A.      I was advised that –

Q.      He was by the front of it –

A.       – he had put the weapon down to his side.

*Id.* at 28-30.

Officer White testified that when he was behind the sheriff's department vehicle, he tried to

negotiate with DeMerrell:

> I do recall some of the negotiations that took place when we first started our cover behind the sheriff's department vehicle while still having our heads lowered.  We were trying to get Mr.  DeMerrell to drop the weapon, put the weapon down.  We were so directly in front of him that – until we heard from another officer that he had brought the gun to his side is when we finally brought our heads up, took position over the hood of the vehicle.

*Id.* at 33.  After DeMerrell had placed the weapon by his side, officer White informed DeMerrell

"'Mike, it's not worth it.'"  *Ibid.*  Officer White told DeMerrell that "there was a 2-year-old child

that was crying on the porch" but DeMerrell "just continued to basically ignore all of our

commands."  *Ibid.*  White Testified further:

-8-

> Q.    When you go behind the engine block of the other vehicle, did you at that point attempt to defuse the situation or negotiate with Mr. DeMerrell?
>
> A.    Yes.
>
> Q.    What were you telling him or asking him to do?
>
> A.    I continuously was telling him to – 'Put the gun down, Mike' – not to do this. 'We go way back.' I've had may contacts with him. . . . I remember saying ' I want to go home at the end of the night. I've got kids, too.' I remember saying something to the effect that, 'I've got a child on the way. You know, we don't want to do this.' And it was basically along those lines.

*Id.* at 113. However, as noted, DeMerrell "completely ignored all of our commands and basically continued to escalate with his actions." *Id.* at 113-14. DeMerrell stated that officer White and the others were not "taking him to jail." *Id.* at 114. According to officer White, DeMerrell taunted that the officers "didn't have the balls to do it, that we were pussies." *Ibid.* According to White, DeMerrell pleaded "'Come on, shoot me. I don't have a vest on,' things along that line." *Ibid.*

Although officer White testified that he saw a weapon earlier through the screen door, he noted later in his deposition that "[w]hen I was advised that the weapon was down at his side, I brought my head up and that's when I first saw the weapon." *Id* at 33. The weapon appeared to be a pistol, what officer White thought looked like a black German luger. *Id.* at 33-34. According to White, the weapon was in DeMerrell's left hand. *Id.* at 34. White said:

> I continued negotiations with him. He continued to ignore our commands, talking with his hand, waving the weapon in our direction. You could tell he was becoming more and more agitated as we spoke to him. And during our negotiations with him he ended up raising the weapon up, taking a few steps towards us. And that's when I discharged my weapon.

*Ibid.* Officer White estimated the distance between him and DeMerrell to be between twenty and twenty-five feet at the time he discharged his weapon. White was "facing towards Mr. DeMerrell over there I would have been across the hood" propped up by his elbow. *Ibid.* White's upper body was exposed at the time. *Ibid.* When the shot was fired, there were six officers on the scene.

-9-

Officer White testified that he was unaware of how exposed the other officers were when he fired

his gun.  *Id.* at 39-40.

Later in his deposition, officer White described DeMerrell's conduct as follows:

Q.      Did you continue to try to talk to Mr. DeMerrell during that period of time?
A.      The entire time.
Q.      Prior to [discharging] you say he advanced?
A.       He took two or three steps forward, while doing so, brought up his arm, pointed in our direction and –
Q.      In advancing does that suggest he got closer to you?
A.      Yes.
Q.      Were the other officers, to your knowledge, exposed to some degree?
A.      Sergeant Brege, who was directly at my left, was exposed somewhat.  He would have to be in order to see the subject.  And Trooper Boulan, who was standing behind me, actually with his firearm over my shoulder, obviously was exposed, also.
Q.      Were any of the other officers trying to talk to Mr. DeMerrell?
A.      Sergeant Brege briefly interacted; 'briefly' you know just because I started losing my voice from yelling and talking so loudly.
Q.      You actually continued to converse to Mr.  DeMerrell to the point where you were losing your voice?
A.      Correct.

. . .

Q.      When DeMerrell advance and trained his weapon in your direction were you able to see the barrel of the gun?
A.      I saw the gun come up and it was pointed in my direction, yes.
Q.      At that point the gun was pointed in your direction.  Did you feel that you were in immediate danger of receiving a mortal would or some serious injury.
A.      Yes, sir.
Q.      Did you feel at that point that those officers around you were also facing that immediate threat?
A.      Yes, sir.

*Id.*  113-17.

Officer White was the only one to fire at DeMerrell.  *Id.* at 40.  The pistol DeMerrell had

later turned out to be an air pellet gun.  *Ibid.*  DeMerrell was taken to Cheboygan Memorial Hospital

where he was pronounced dead on arrival.

Neither of the parties took the depositions of the other officers; however, the defendants

submitted copies of their incident reports.  Trooper Pionk stated that he was positioned at the

northeast corner of DeMerrell's residence and observed White on the porch.  He then ran back to

his patrol car when he heard White yell that DeMerrell had a gun.  Pionk wrote that he saw

DeMerrell exit his residence, and despite White's repeated commands for DeMerrell to stop and

drop his weapons, DeMerrell walked down his driveway with a pistol in his left hand.  Pionk's

report continues:

> I observed the suspect, DeMerrell, waive the firearm around, sometimes pointing it
> toward the direction of officers, and sometimes waiving his hand with the firearm
> and bringing it up and pointing it toward the northeast.
>
> I heard officers tell the suspect to drop the gun.  I heard Officer White state to the
> suspect multiple times in loud verbal commands to drop his gun, not to point the gun
> at officers, and not to advance at officer.  The suspect responded by being hostile and
> yelling back to Officer White 'F-ck you.  I'm not going to jail.'  DEMERRELL took
> a very aggressive posture, kept yelling at officers, yelling specifically at Officer
> White at times and telling Officer White multiple times 'F-ck you' and 'You know
> me, you're not taking me.'  DEMERRELL told Officer White to 'Go ahead and
> shoot'.  During the entire time of this verbal confrontation, DEMERRELL continued
> to waive the gun around and occassionally brought the gun partially up and pointed
> in the direction of officers.  DEMERRELL then advanced toward officers and
> walked around and stood in front of the white stationwagon.  As this was happening,
> Officer White gave loud verbal commands for DEMERRELL to drop his weapon.
> Officer White told DEMERRELL that nobody said anything about going to jail . .
> . . Officer White told DEMERRELL to just put the gun down, and that if he just put
> the gun down we could take care of this situation.  DEMERREL continued to be
> irate, aggressive, and yelling for Officer White to 'Go ahead and shoot' him.
> DEMERRELL told Officer White that he didn't 'have the balls' to shoot him.
> DEMERRELL thrust his chest out toward officers and was telling them to go ahead
> and shoo him.  DEMERRELL then tapped his chest with his hand and stated to
> officers 'I don't have what you guys have' (implying that he did not have a bullet

resistant vest).  DEMERRELL then continued to yell at officers to 'go ahead and do it' asking them 'what are you afraid of' and continued to be aggressive with officers.

. . .

Officer White tried to multiple tactics to make a connection with DEMERRELL, in an attempt to diffuse the situation.  During this time, DEMERRELL kept yelling at officers and telling them to 'go ahead and shoot' him and that he 'was not going to jail' and saying 'you're not going to take me alive.'

. . .

I observed DEMERRELL wave the handgun around with his left hand and bring it up and point  in the direction of officers several times.  I could see DEMERRELL standing in front of the white stationwagon and he then proceeded to start walking toward officers.  At that time, I could only see his upper body because his lower body was blocked from my view by the front hood area of Officer White's patrol vehicle.  As DEMERRELL continued to go toward the officers who were behind the . . . Sheriff patrol vehicle, Officer White continued to give DEMERRELL loud verbal commands not to advance . . . and not to point his firearm toward officers.  Officer White again told DEMERRELL he did not want to shoot him.  DEMERRELL continued to advance on officers, and just before I lost sight of DEMERRELL's upper body behind Officer White's patrol vehicle, I did observe DEMERRELL to start to bring his arm up in a motion consistent with pointing the firearm toward officers who were stationed behind the . . . Sheriff unit.  As Officer White continued to give verbal commands to DEMERRELL, I heard a single shot fired.  I then saw DEMERRELL fall to the ground.

Def.s' Mot. Summ. J. Ex. 8, Pionk Statement.

A neighbor, Patrick Nichols, gave a statement to police.  As to the critical events, Nichols

stated:

Patrick said he then saw his neighbor (DeMerrell) on the front porch of the house.  The police were still behind the patrol car.  Demerrell then started walking toward the police and the police were hollering at him.  Demerrell walked to a white small car in his driveway and leaned up against it.  Demerrell was waiving his arms around in big circles.  Patrick said he saw what he believed to be a long barreled revolver in Demerrell's left hand.  Demerrell was waiving this gun around and in the direction of the police cars and police officers.

Patrick said he heard Demerrell say something to the effect of 'shoot me'.  Patrick said he heard the police say something like 'put down the gun'.  Patrick said there

was lots of yelling and he could not make it out. Patrick said Demerrell was still waiving the gun around and sticking out his chest. Demerrell stepped away from the white car in the drive and again started to walk toward the police and at that time Patrick said he heard on shot. The police were still behind a police car. Patrick said DeMerrell fell backwards after the shot.

Pl.'s Resp. Br. Ex. F, Nichols Statement.

The Cheboygan County public safety department has a written policy on the use of lethal force. That policy reads, in pertinent part:

### VII. LETHAL FORCE PROCEDURES

A.     Authorized Use of Lethal Force

The use of lethal force as defined under section II.E of this policy is considered a measure of <u>last resort</u> and is limited to the following situations:

1.     To protect the officer or another from what is reasonably believed to be an immediate threat of death or serious physical injury;

2.     To prevent the escape of a subject who is fleeing with an inherently violent felony crime, and the officer has probable cause to believe that the subject poses significant threat of death of serious physical injury to the officer or others;

3.     Whenever any one of the two (2) conditions described above are present, where feasible, officers shall identify themselves and provide a warning before the force is applied.

B.     Use of Lethal Force Prohibited

Lethal force may not be used in the following situations, except when necessary for self defense of others from a felonious assault that is likely to result in death or serious physical injury:

1.     When it appears likely that an innocent person may be injured;

2.     To shoot at a moving vehicle. This tactic seldom, if ever, proves effective and poses a significant risk to innocents.

3.     To shoot from a moving vehicle, except as a 'Last Resort' as defined under Section II.E of this order;

4.     Solely because a subject fails to stop for a blockade or obey a command to stop; and

5.     To fire 'warning' shots.

Def.s' Mot. Summ. J. Ex. 12, Use of Force Policy. The policy defines "lethal force" as "that amount of force that could result in death or serious bodily injury." *Ibid.* Finally, "last resort" situations are defined as "those wherein immediate and drastic measures must be undertaken by an officer in order to protect human life." *Ibid.* According to police chief Kurt Jones, officer White underwent certification in the use of deadly force, successfully completed required training, had his references checked, and underwent physiological evaluations. Def.s' Mot. Summ. J. Ex. 14. Jones dep. at 22-30.

The parties each retained experts to review the events leading up to DeMerrell's death. The plaintiff employed the services of David M. Grossi, a retired police lieutenant from upstate New York. *See* Pl.'s Resp. Br. Ex. D., Grossi Report. The defendant's hired Darrel L. Ross, Ph.D., a psychologist and former police academy instructor and department of corrections employee, among others. *See* Def.'s Mot. Summ. J. Ex. 17, Ross Report. Both experts reviewed the files presently before the Court and, not surprisingly, reached opposite conclusions: Grossi opined that the use of force in this instance was not warranted, and Ross felt it entirely appropriate.

On August 20, 2004, the plaintiff filed a four-count complaint in this court alleging violations of the Michigan constitution with respect to all defendants (count one); assault and battery under Michigan law against officer White (count two); wrongful death under Michigan law against all defendants (count three); and violation of the Fourth Amendment via 42 U.S.C. § 1983 against all defendants (count four). Thereafter, the defendants filed the present motion for summary judgment arguing that the plaintiff's claims are precluded on the basis of qualified immunity under federal law and governmental liability under Michigan law, and that liability cannot lie against the

-14-

City and Jones on a *respondeat superior* or and other theory.  The plaintiff has filed a response in opposition.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial.  The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim.  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148  (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).  Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 587 (1986).  Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a

motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

-16-

A.

The Court turns first to the claim against Officer White and his proffered defense of qualified immunity. Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of this defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (internal quotes and citation omitted).

The Sixth Circuit recently reiterated the requirement announced in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), that this defense must be analyzed in two stages. *See Lyon v. City of Xenia*, __ F.3d __, __, 2005 WL 1846994 *3 (6th Cir., August 4, 2005). "When confronted with a claim of qualified immunity, a court must ask first the following question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Brosseau v. Haugen*, 125 S. Ct. 596, 598 (2004) (per curiam) (internal quotes and citation omitted). The second step requires a determination if the constitutional violation transgressed a right that was clearly established at the time, but "[i]t is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 599 (internal quotes and citation omitted).

-17-

The constitutional right at issue in the plaintiff's action under 42 U.S.C. § 1983 is the right to be free from unreasonable seizures. *See* Const. Am. IV. "While it is not always clear just when minimal police interference becomes a seizure . . . there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (citation omitted). In order to be actionable, such seizures must be "objectively unreasonable," as that term is understood in Fourth Amendment jurisprudence, which requires an assessment of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that excessive force claims must be adjudicated under the Fourth Amendment by "judg[ing] from the perspective of a reasonable officer on the scene," devoting "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" in light of all the circumstances and "without regard to the [officer's] underlying intent or motivation"). The Supreme Court provided guidance in cases where deadly force, as here, is used in *Tennessee v. Garner*. Although that case concerned a fleeing suspect, the Court's analysis is instructive. After declaring that deadly force is not allowable in all cases of a fleeing felon, the Court stated:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11-12.

The defendants in this case contend that Officer White acted reasonably under the circumstances because (1) DeMerrell had a gun; (2) there was a small child in the house; (3) when DeMerrell exited the home, he pointed his gun at police at times; (4) DeMerrell would not listen to reason and put the gun down; (4) he was told that police did not want to have to shoot him; (5) White told him not to advance closer; (5) DeMerrell was drunk; (6) DeMerrell used profanity and encouraged officer White and the others to shoot him; (7) he was fifteen to twenty five feet away from the officers; (8) White appeared aware that the other officers might be exposed; and (8) DeMerrell ultimately advanced on police and trained his gun on the officers.   The plaintiff argues that a fact issue exists because Patrick Nichols stated that DeMerrell was flailing his hands about and did not point the gun at police.   However, Nichols' statement cannot fairly be read as contradicting White's testimony and the statements of the other officers.   Although Nichols did not confirm that DeMerrell pointed his gun at White, Nichols did state that "Demerrell was still waiving the gun around and sticking out his chest" when Nichols heard the shot fired.

This information is consistent with the overwhelming evidence of DeMerrell's threatening conduct in the record.   For instance, trooper Pionk recalled that DeMerrell waived his arms and at times pointed the gun at officers.   DeMerrell advanced on officers, and Pionk observed what appeared to be DeMerrell pointing his gun at police right before he was shot.   Def.s' Mot. Summ. J. Ex. 8, Pionk Statement.   Officer Hartman stated in his report that DeMerrell took two or three steps toward officer White and pointed the gun at officers before being shot.   *See* Def.s' Mot. Summ. J. Ex. 9,  Hartman Report.   Sergeant Brege, also on the scene, observed DeMerrell point the gun at officers.   *See* Def.s' Mot. Summ. J. Ex. 10,  Brege Report.   Deputy Brenda Chimner, also present at the scene, observed DeMerrell advance toward officers with the gun pointed in their

-19-

direction waving it back and forth; she stated she was ready to shoot DeMerrell but did not because officer White had already responded.  *See* Def.s' Mot. Summ. J. Ex. 11, Chimner Report.  In sum, all officers observed DeMerrell advance toward them with a gun pointed.  At least one officer was ready to shoot DeMerrell as well.

Officer White was confronted with a dangerous, volatile situation involving an intoxicated, armed, aggressive suspect that, it is uncontested, was advancing on the police and defying commands to stand down.  As the court of appeals noted in *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000), "we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Id.* at 601.  Perhaps officer White did not have to discharge his shotgun to end the confrontation – indeed, it turned out that DeMerrell's weapon was an air pistol.  However, that is not the appropriate consideration under an objective reasonableness standard.  Based on the undisputed facts, the Court finds that the plaintiff has not shown that officer White's actions were unreasonable or that the use of deadly force in this case contravened the Fourth Amendment.

Because no constitutional violation has been proved, there is no need to proceed to the second step in the qualified immunity analysis.  Moreover, the plaintiff's claim under section 1983 must fail.  Officer White is entitled to summary judgment on that count.

B.

The plaintiff also seeks to hold Chief of Police Kurt Jones liable for DeMerrell's death because Jones was officer White's supervisor. The Sixth Circuit has recently restated the standard for imposing supervisory liability under 42 U.S.C. § 1983:

> [T]he § 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondeat superior. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Turner v. City of Taylor*, 412 F.3d 629, 643 (6th Cir. 2005); *see also Mills v. City of Barbourville*, 389 F.3d 568, 580 (6th Cir. 2004) (holding that a defendant supervisory official cannot be liable for an underling's actions unless there is proof that the defendant "is personally responsible for the alleged unconstitutional actions that caused his injury").

Supervisory liability, therefore, is premised on the underlying unconstitutional actions of an officer over whom he exercises authority. *See Turner*, 412 F.3d at 643. Since officer White's actions were not unreasonable in this case, there is no liability that can attach derivatively. As a result, chief Jones cannot be held liable for officer White's conduct.

The plaintiff has offered evidence of several citizen complaints about officer White's official conduct in other cases. That evidence is irrelevant, however, given the Court's earlier finding. As noted, "[i]n order to establish liability pursuant to § 1983, the plaintiff must prove that the defendant, as a supervisory official, is personally responsible for the alleged unconstitutional actions that caused his injury. . . . At a minimum, the plaintiff must demonstrate that a supervisory official condoned, encouraged, or knowingly acquiesced in the alleged unconstitutional misconduct." *Mills*,

-21-

389 F.3d at 580.   Here, although there is evidence that Jones was aware of citizens' complaints in the past that officer White had acted forcefully, irresponsibly, and unprofessionally, the plaintiff does not present evidence that Jones had *any* role in the shooting of DeMerrell.   Jones is entitled to summary judgment on the plaintiff's federal claims as well.

C.

The plaintiff also has brought a claim against the City of Cheboygan.   Municipalities are considered "persons" within the meaning of section 1983; however, a city "cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."   *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, municipal liability will be found only when the alleged unconstitutional act "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers."   *Id.* at 689.   A municipality also "may  be sued for constitutional deprivations visited pursuant to governmental custom even though such custom has not received formal approval through the body's official decision making channels." *Berry v. City of Detroit,* 25 F.3d. 1342, 1345 (6th Cir. 1994).

As the Supreme Court recognized in *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), a city can be held liable under Section 1983 for failure to train its employees.   However, in order to prevail on a section 1983 "failure to train" claim, the plaintiff must show that the "training program is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury."   *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).   A municipality can be held liable for inadequate police training under section 1983 "only where [the] failure to train amounts to deliberate

-22-

indifference to rights of persons with whom police come into contact." *City of Canton*, 489 U.S. at 388. The mere fact that a few officers may be inadequately trained is not sufficient to demonstrate liability, as the shortcomings could be caused by officer inattention or poor administration. *Id.* at 391. Allegations that the officers in question could have been better trained are also insufficient. *Id.* Rather, the "failure to train [must] reflect[] a deliberate or conscious choice by a municipality." *Id.* at 389.

In *City of Canton*, the Supreme Court recognized two fact patterns in which a citizen could state a claim for failure to train. First, the nature of the officers' duties could be such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" in not providing training. *Id.* at 390. The Court isolated the need to apprehend fleeing felons and the possession of firearms by officers as indicating to a "moral certainty" that proper training would be required. *Id.* n.10. Second, the police may have so often violated constitutional rights that the need for further training must have been "plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Ibid*; *see also id.* at 397 (O'Connor, J., concurring) (finding that such behavior constitutes "tacit authorization" of the officers' conduct).

The plaintiff seeks to hold the municipality liable for the actions of officer White. No matter what the theory, the plaintiff must first prove an actionable constitutional deprivation. Here, as noted, officer White's use of force likely was not unreasonable. As a consequence, there has been no constitutional deprivation as that term has been defined under section 1983 and therefore no basis

-23-

for municipal liability here. The City likewise is entitled to summary judgment on the plaintiffs' federal claims.

D.

The plaintiffs have also advanced claims arising under Michigan law under this Court's supplemental jurisdiction, since those claim form part of the same controversy as the section 1983 claims. *See* 28 U.S.C. § 1367(a). However, Section 1367 also provides:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed for want of jurisdiction, all other state-law claims must be dismissed. *See Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996). However, if the federal claims were dismissed on the merits, the question of whether to retain jurisdiction over the state-law claims rests within the Court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). Thus, pursuant to section 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over state law claims in this case. *Weeks v. Portage County Executive Offices,* 235 F.3d 275, 279 (6th Cir. 2000).

"Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United*

-24-

*Mine Workers of Amer. v. Gibbs*, 383 U.S. 715, 726 (1966).  The dismissal of the claim over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court.  *Blakely*, 276 F.3d at 863.  The Court believes that comity favors the exercise of discretion by declining to entertain the plaintiff's state law claims here.

III.

The Court determines that the plaintiff has failed to bring forth facts that establish a material fact question supporting all the elements of her section 1983 claims against each of the defendants.  The defendants are entitled to a judgment as a matter of law on the plaintiff's federal claims.  The Court also declines to exercise supplemental jurisdiction over the plaintiff's state law claims.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt # 19] is **GRANTED IN PART**.

It is further **ORDERED** that the claims in the complaint based on 42 U.S.C. § 1983, respectively, are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the remaining claims stated in the complaint are **DISMISSED WITHOUT PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 29, 2005

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 29, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS

---